IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| AMIR HOSSEIN SHEIKHAN, et al., | CIVIL NO. 23-00460 JAO-BMK |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION TO REMAND, ECF NO. 42 |
| vs. | |
| HAWAIIAN ELECTRIC INDUSTRIES, INC., et al., | |
| Defendants. | |

**ORDER GRANTING PLAINTIFFS' MOTION TO REMAND, ECF NO. 42**

This action arises out of the August 8, 2023 Maui wildfire that claimed over one hundred lives and decimated Lahaina.  Plaintiffs, a family who lost their home as a result of the fire, initially filed suit in Hawaiʻi state court against private utility companies, private landowners, and governmental entities for failing to prevent the rapid spread of the fire, and causing and contributing to it.  The action was then removed to federal court.  Plaintiffs move to remand on a number of grounds, asking the Court to return this action to the state court on Maui.  ECF No. 42.  All defendants who have appeared, except for the State of Hawaiʻi, oppose remand and argue that this case and other individual actions like it should remain in federal court under the Multiparty, Multiforum Trial Jurisdiction Act of 2002

("MMTJA"), which provides federal jurisdiction over cases arising out of certain mass casualty accidents.  ECF No. 61.

For the following reasons, the Court concludes this action (and others like it) were not properly removed under the MMTJA and so GRANTS Plaintiffs' motion and REMANDS this action to the Circuit Court of the Second Circuit, State of Hawaiʻi.

## I.      BACKGROUND

### A.      Facts

Unfortunately, everyone in Hawaiʻi and across the world is generally familiar with the facts underpinning Plaintiffs' claims, which arise out of the country's deadliest wildfire in the past century.  The Court does not set out to recount Plaintiffs' allegations in full here for two reasons.  First, many of the finer details are not relevant to the Court's jurisdictional analysis.  But also, it is impossible for the Court to capture the profound sense of loss permeating this case and those like it.  None of the Defendants disagree, even if they dispute their alleged role in contributing to the loss.  With that in mind, the Court turns to the alleged facts relevant to the question presented here—Where does this case belong?

In the days leading up to August 8, 2023, the National Weather Service issued public notices that Hawaiʻi could be impacted by the developing Hurricane

Dora, including that strong winds and dry conditions presented a high fire risk. *See, e.g.*, ECF No. 1-2 ¶¶ 42–53.[1]  Around 6:30 a.m. on August 8, 2023, a windstorm caused power lines to fall near Lahainaluna Road, causing a fire (what the Court will refer to throughout as the "Lahaina Fire").  *See, e.g.*, *id.* ¶¶ 57–60. At 3:30 p.m., the Lahaina Fire broke containment and within 20 minutes became a "firestorm" that spread rapidly throughout the 7.8-square mile town[2] of Lahaina. *Id*.  ¶¶ 61, 63–64.  The Lahaina Fire "raged for hours," burning over 2,200 structures across 2,100 acres and killing over 100 people.  *Id.* ¶ 66.[3]  Plaintiffs lost their home and everything in it.  *Id.* ¶ 22.

---

[1]  Defendants note that, because investigations into the fire are ongoing, they accept Plaintiffs' allegations as true for the purpose of this motion.  *See* ECF No. 61 at 17 n.2.  The Court will as well.

[2]  ECF No. 42 at 23; ECF No. 61 at 18 (both citing United States Census Bureau, QuickFacts, Lahaina CDP, Hawaii, https://www.census.gov/quickfacts/lahaina dphawaii [https://perma.cc/5HP9-97ZP]) (all Internet materials as last visited March 7, 2024).  The parties refer to the *town*; under state law, the *district* of Lahaina may be even more expansive.  *See* Hawai'i Revised Statutes § 4-1(2)(C)–(D) ("For election, taxation, city, county, and all other purposes, the State shall be divided into the following districts . . . [a]ll that portion of central Maui lying east of a line along the boundary of the ahupuaas of Kahakuloa and Honokohau to the peak of Eke crater, thence along the ridge of mountains and down the bottom of Manawainui gulch to the sea, and west of the boundary of Makawao district, to be styled Wailuku district; [a]ll that portion of Maui lying west of Wailuku district, to be styled the Lahaina district").

[3]  Plaintiffs allege at least 115 people died, ECF No. 1-2 ¶ 66; however, more recent data indicates the confirmed death toll stands at 101 as of the date of this Order.  *See* Cammy Clark, *Lahaina Fire Death Toll Rises To 101 After Police*

They bring state law claims against the following groups of defendants: (1) Hawaiian Electric Industries, Inc.; Hawaiian Electric Company, Inc.; Hawaiʻi Electric Light Company, Inc.; and Maui Electric Company, Limited (collectively, "HECO"); (2) Charter Communications, Inc.; Time Warner Cable Information Services, LLC (Hawaiʻi) dba Oceanic Time Warner; Cincinnati Bell, Inc.; and Hawaiian Telcom, Inc.[4] (collectively, "Telecom Defendants"); (3) the trustees of the Estate of Bernice Pauahi Bishop; Hope Builders, LLC; and Wainee Land & Homes, LLC (collectively, "Landowner Defendants"); (4) the State of Hawaiʻi; (5) the County of Maui ("Maui County"); and (6) Herman Andaya.[5]

Broadly speaking, Plaintiffs allege the Lahaina Fire and the vast destruction resulting from it were preventable. *See generally* ECF No. 1-2. They fault HECO and the Telecom Defendants for failing to prevent the Lahaina Fire and its spread by failing to design, construct, inspect, and maintain their infrastructure in a manner necessary to avoid known fire risks, which includes HECO's refusal to de-energize their facilities on August 8, 2023 despite "High Wind Warnings" and

---

*Identify Remains Of Missing Person*, Honolulu Civil Beat (Feb. 13, 2024), https://www.civilbeat.org/2024/02/lahaina-fire-death-toll-rises-to-101-after-police-identify-remains-of-missing-person/ [https://perma.cc/37H9-L59V].

[4] Plaintiffs erroneously refer to Hawaiian Telcom, Inc. as "Hawaiian Telecom, Inc." *See* ECF No. 1-2 at 2; *id.* ¶ 7.

[5] Andaya, who has not appeared in this action, served as the Administrator of the County of Maui's Emergency Management Agency. *See* ECF No. 1-2 ¶ 15.

"Red Flag Warnings" regarding wind and fire risks.  *See id.*  They fault the Landowner Defendants for failing to prevent the Lahaina Fire and its spread by not managing the vegetation on their land.  *See id.*  More specifically, they claim the Landowner Defendants facilitated the surge of the Lahaina Fire by allowing dry, invasive vegetation to flourish on their properties, causing the fire to spread more rapidly and intensely.  *See id.*  They fault the State and Maui County for mismanagement of land and people, contending those entities failed to: prepare for, mitigate, and address known wildfire risks on Maui; warn people about the Lahaina Fire; and implement evacuation procedures, all of which resulted in chaos, destruction, and death.  *See id.*

The location of these deaths is essential to the jurisdictional analysis here, so the Court finds it helpful to include one of the maps offered by Plaintiffs—based on data compiled by the Maui County Police Department—that provides visual context for the geographic area impacted by the Lahaina Fire and the precise locations of some of the confirmed fatalities.[6]

---

[6]  Although Plaintiffs have introduced additional evidence outside the pleadings to attack removal here, the Court still views their challenge as a facial one.  *See DeFiore v. SOC LLC*, 85 F.4th 546, 552–53 (9th Cir. 2023).  In other words, there is no factual dispute about the location of the deaths (and Defendants do not object to the Court considering this evidence).  Instead, the parties dispute whether, based on these undisputed locations, the requirements of the MMTJA are met.



Fatality Locations
Building Footprints
Destroyed
Not Destroyed

Lahaina Wildfire
Maui, Hawaii

6

ECF No. 71-4.  Not all fatalities are reflected on the map copied above because not all fatalities occurred in Lahaina or even on Maui; three occurred at a hospital on Oʻahu.  *See* ECF No. 71-1 at 66.  The map makes clear the Lahaina Fire impacted miles of land, destroying various structures including homes, hotels, and businesses, crossing major thoroughfares in its path, and causing deaths miles apart up and down the coast of West Maui, and miles apart mauka to makai.  *See* ECF Nos. 71-2, 71-3, 71-4; *see also* ECF No. 56-2.

## B.   Procedural History

As noted above, Plaintiffs initially filed suit in state court.  ECF No. 1. Some of the Telecom Defendants removed, and the rest of the Telecom Defendants joined in removal.  ECF No. 1; ECF No. 6.[7]  Plaintiffs moved to remand.  ECF No. 42.  Because numerous other actions related to the Lahaina Fire had also been removed and assigned to the undersigned, the Court directed coordinated briefing on the motion to remand in this case alongside the motions to remand that had been filed in two putative class actions, *Eder*, *et al. v. Maui Elec. Co., Ltd.*, *et al.*, CV No. 23-00459-JAO-BMK, and *Naki v. Hawaiʻi*, *et al.*, CV No. 23-00435-JAO-

---

[7]  Plaintiffs voluntarily dismissed some of the Telecom Defendants—namely Charter and Time Warner—and intend to name a different defendant (Spectrum Oceanic, LLC) after their motion to remand is resolved.  ECF No. 61 at 43 n.28; ECF No. 42 at 13; ECF No. 33.  None of this is material to the Court's jurisdictional analysis here.

BMK, where the removing defendants contend jurisdiction exists under both the MMTJA and the Class Action Fairness Act.[8]  Because most of the other removed actions—now totaling around 90—are not putative class actions, and thus were removed *only* based on the MMTJA, the Court permitted the plaintiffs in those other cases to file "placeholder" remand motions, with the intention of proceeding with the remand motion in this case as the lead case on the issue of jurisdiction under the MMTJA.  To facilitate that, the Court permitted Plaintiffs in this case to file a supplement to their motion to remand, in order to raise additional issues that might be relevant in other cases removed based on the MMTJA.  ECF No. 56. Defendants in this action, *Eder*, and *Naki* that support removal filed an omnibus opposition addressing the remand motions in all three cases, as well as a related motion to sever filed by the plaintiffs in *Naki*.  ECF No. 61.[9]  The Court will refer to those Defendants collectively as "Removing Defendants."  The Court held a consolidated hearing on the pending motions in this case, *Eder*, and *Naki* on March 6, 2024.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 1441, a defendant may remove a civil action brought in a

---

[8]  Although the State did not file a motion to remand in this case, counsel for the State confirmed at the hearing that it supports remand here for the reasons articulated in its motions to remand filed in *Eder* and *Naki*.

[9]  The Court will cite to the docket entry in this case, ECF No. 61.

state court to federal district court if the district court has original jurisdiction.  *See Abrego Abrego v. Dow Chemical Co.*, 443 F.3d 676, 679–80 (9th Cir. 2006).  The removing defendant bears the burden of establishing that removal is proper and that jurisdiction exists.  *See Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027, 1034 (9th Cir. 2014).  If the removing party does not meet that burden, a district court must remand.  28 U.S.C. § 1447(c).

## III.   DISCUSSION

Removing Defendants contend removal was appropriate here under the MMTJA, which provides for jurisdiction over any civil action involving minimal diversity "that arises from a single accident, where at least 75 natural persons have died in the accident at a discrete location," if at least one interstate criteria is met regarding where defendants reside and where the accident occurred.  28 U.S.C. § 1369(a).[10]  Even if jurisdiction exists under the MMTJA, a district court "shall

---

[10]  The interstate criteria, only one of which must be met, are:

> (1) a defendant resides in a State and a substantial part of the accident took place in another State or other location, regardless of whether that defendant is also a resident of the State where a substantial part of the accident took place;
> (2) any two defendants reside in different States, regardless of whether such defendants are also residents of the same State or States; or
> (3) substantial parts of the accident took place in different States.

28 U.S.C. § 1369(a).

abstain" from hearing an action where "the primary defendants" and "the substantial majority of all plaintiffs" are citizens of the same State, and where the claims asserted will primarily be governed by the laws of that State.  28 U.S.C. § 1369(b).  There is also a "piggyback" provision that permits defendants to remove cases arising "from the same accident" even if those cases could not have initially been brought in federal court.  28 U.S.C. § 1441(e)(1)(B).

Because the Court agrees with Plaintiffs that this action does not "arise[] from a single accident, where at least 75 natural persons have died in the accident at a discrete location" under § 1369(a), the Court need not address the parties' arguments regarding whether or not it must abstain under § 1369(b), nor Plaintiffs' numerous other challenges to removal.  More specifically, because it is undisputed that the deaths here occurred across the entirety of Lahaina, and the Court concludes that Lahaina is not a "discrete location" under the MMTJA, remand is warranted on this basis alone, and none of the parties' other arguments need be addressed.

**A.     Whether 75 Deaths Occurred at a Discrete Location**

The MMTJA references "discrete location" twice.  First, jurisdiction under the MMTJA exists only if "75 natural persons *have died* in the [single] accident *at a discrete location*," and next, the statute defines "accident" as "a sudden accident, or a natural event culminating in an accident, that *results in death incurred at a*

10

*discrete location* by at least 75 natural persons[.]" 28 U.S.C. § 1369(a), (c)(4) (emphases added).  The plain language therefore makes clear that, regardless of whether the accident must also occur at a discrete location (and the Court need not resolve that question here), at least 75 deaths must have occurred at that discrete location.  The parties dispute whether that jurisdictional requirement is met here, where over 100 people died as a result of the Lahaina Fire, but the precise locations of their deaths span miles, across various neighborhoods, with at least one in the ocean and others at hospitals on Oʻahu.  *See* ECF No. 71-1 at 66 ("There were approximately 42 people recovered from inside structures, 39 from outdoor locations, 15 from inside vehicles, and one in the water.  An additional three deaths were later reported to have occurred in hospital on Oahu due to fire related injuries."); ECF Nos. 71-2, 71-3, 71-4; ECF No. 56-2.

Plaintiffs contend the deaths here were too geographically dispersed to have happened "at a discrete location."  Relying on dicta in a district court case, Removing Defendants argue that, "when an accident destroys an identifiable location in a way that leads to common allegations 'among claimants to liability,' as is clearly the case here, the MMTJA applies."  ECF No. 61 at 33 (quoting *Case v. ANPAC La. Ins. Co.*, 466 F. Supp. 2d 781, 797 (E.D. La. 2006)).  They also contend that "a 'discrete location' is not inherently any given size; it need only be 'individual,' 'separate' or 'distinct.'"  *Id.* (quoting Black's Law Dictionary (11th

ed. 2019), and referring to *NW Ecosystem All. v. U.S. Fish & Wildlife Servs.*, 475 F.3d 1136, 1138 (9th Cir. 2007), an Endangered Species Act case).  In other words, they say, at least in this case, Lahaina is a discrete location.

The MMTJA does not define "discrete location," so the Court must engage in statutory interpretation to resolve the parties' dispute.  "In statutory interpretation, the plain meaning of a statute controls where that meaning is unambiguous." *Meyers v. Birdsong*, 83 F.4th 1157, 1160 (9th Cir. 2023) (citation and quotations omitted).  Whether language is plain or ambiguous depends on the language itself, the context in which the language is used, and the broader context of the statute. *Moran v. Screening Pros, LLC*, 943 F.3d 1175, 1183 (9th Cir. 2019).  If the language is ambiguous, the Court must turn to "canons of construction, legislative history, and the statute's overall purpose to illuminate Congress's intent." *Id.* (citation omitted).

### 1.    The Language Itself and Dictionary Definitions

Turning first to the language itself, the dictionary definition of "discrete location" favors Plaintiffs' interpretation and remand.  While Removing Defendants are correct that "discrete location" is not defined by, for example, a particular measurement of square miles, it doesn't make sense that such locations "need only be 'individual,' 'separate' or 'distinct.'" *See* ECF No. 61 at 33.  After all, entire countries are separate and distinct.

Discrete indeed means "[i]ndividual; separate; distinct," *Discrete*, Black's Law Dictionary (11th ed. 2019), or "constituting a separate entity: individually distinct," *Discrete*, Merriam-Webster, https://www.merriam-webster.com/dictionary/discrete [https://perma.cc/W3LG-PMB3].  But the second word in "discrete location" means "[t]he specific place or position of a person or thing," *Location*, Black's Law Dictionary (11th ed. 2019), or "a position or site occupied or available for occupancy or marked by some distinguishing feature," *Location*, Merriam-Webster, https://www.merriam-webster.com/dictionary/location [https://perma.cc/MB49-HHGY].  Taken together, the phrase "discrete location" thus connotes a specific, separate, individual site or position where a person or thing can be found.

The Court finds it difficult to equate these definitions, connoting an individual and specific site or position, with a land mass spanning 7.8 square miles. And it finds doing so particularly difficult when an entirely *different* word—locality—seems to fit Removing Defendants' proposed definition for discrete location, i.e., any location separate from other locations and therefore the entire town of Lahaina.  *See, e.g.*, *Locality*, Black's Law Dictionary (11th ed. 2019) (defining a *locality* as "[a] small area of a city, county, or state; vicinity; neighborhood; community").  It also strains credulity to say that, in everyday speech, a request for someone or something's "discrete location" would be

13

satisfied by providing only the applicable city or town—as opposed to something akin to the precise coordinates of where that person or thing can be found.  *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) ("It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") (citation and quotations omitted)).  But more on that in a moment.

### 2.     The Language in the Context of the MMTJA

The Court recognizes that "words are chameleons, which reflect the color of their environment," and that dictionary definitions alone do not control in statutory interpretation.  *Yates v. United States*, 574 U.S. 528, 538–39 (2015) (citation omitted) (plurality opinion).  But viewing the term "discrete location" in the broader context of the MMTJA does not justify concluding that all of Lahaina is a "discrete location."  *See id.* at 537 (noting that, "[o]rdinarily, a word's usage accords with its dictionary definition" but that "[i]n law as in life, . . . the same words, placed in different contexts, sometimes mean different things").

### a.     The MMTJA's Reference to Deaths *at* a Discrete Location

For one, the Court finds Congress's use of the locational preposition "at" preceding "a discrete location" supports interpreting the MMTJA as requiring that the 75 deaths occur at a place more finite than an entire town—as compared to if Congress had chosen to require only that the deaths occur *in* a discrete location,

which connotes a more general, geographically expansive location.[11]  Again, in plain English: identifying one's discrete location as *at* the banyan tree *in* Lahaina makes more sense than saying one is *at* Lahaina.  *See Nielsen v. Preap*, 586 U.S. -- -, 139 S. Ct. 954, 965 (2019) ("Because words are to be given the meaning that proper grammar and usage would assign them, the rules of grammar govern statutory interpretation unless they contradict legislative intent or purpose[.]") (citation, alteration, and internal quotation omitted); *Ehart v. Lahaina Divers, Inc.*, 92 F.4th 844, 852 (9th Cir. 2024) ("Most common English words have a number of dictionary definitions[.]  One should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.") (citation omitted).

Of course, use of *in* could make sense for a "discrete location" (e.g., *in* a home on Loahilahi Place or *in* a store on Front Street).  But the point is that for Removing Defendants' proposed definition of Lahaina as a "discrete location"

---

[11]  *See, e.g., At, prep.*, Oxford English Dictionary, https://doi.org/10.1093/OED/ 6540937381 [https://perma.cc/VDS2-RGXL ] ("*At* expresses the position reached by completed motion *to*, or that which is left by motion *from*: lines drawn *to* a point, *from* a point, or *through* a point, meet or intersect *at* the point."); *In, prep.*, Oxford English Dictionary, https://doi.org/10.1093/OED/1059165504 [https://perma.cc/L5XU-FXYE ] ("Primarily *in* (of position) is opposed to out of *prep.*: anything which is in a given space is not out of it, and vice versa. [] The simple prepositions nearest in sense to *in* are at *prep.* and on *prep.*, with which *in* sometimes shows some semantic overlap, e.g. 'in Oxford' or 'at Oxford'[.]").

here, that definition does *not* make sense when combined with the locational preposition *at*, which is what Congress chose to use.

Indeed, when asked what his discrete location was during the hearing, counsel for HECO initially said "Honolulu."  Of course, it is hard to imagine the entire city of Honolulu as a discrete location.  But, when pushed to explain whether he was "in" or "at" Honolulu, his answer that he was "at Honolulu" was certainly curious at best.

### b.    The MMTJA's Reference to Multi-State Accidents

Removing Defendants contend that, because one way to meet the interstate component of the MMTJA is showing that "substantial parts of the accident took place in different States," interpreting "discrete location" as something smaller than an entire town would render that provision of the MMTJA superfluous.  *See* ECF No. 61 at 33 (referencing 28 U.S.C. § 1369(a)(3)); *see also* 28 U.S.C. § 1369(a)(1) (providing the interstate component can also be met if a defendant resides in one State "and a *substantial part* of the accident took place in another State or other location" (emphasis added)).  But those provisions refer to the location of the *accident*—not the *deaths*.  Regardless, an accident can take place in different States and still cause deaths at a "discrete location," e.g., a plane crash can occur at the border of two States and so meet that criteria—yet still result in deaths incurred at a singular location more akin to the size of one building rather

16

than an entire town.  *Cf. Case*, 466 F. Supp. 2d at 798 (quoting 136 Cong. Rec. H3116–18 (daily ed. June 5, 1990) (statement of Rep. Fish) (addressing a predecessor to the MMTJA, noting that the language "substantial part" of an accident "is only intended to address the highly unusual circumstance, where an accident otherwise covered by the legislation, would occur in more than one judicial district—*such as a mid-air plane crash that occurs above the border of two States*") (emphasis added)).  Indeed, it is undeniable that plane crashes provided a major impetus for the MMTJA.  *See* H.R. Conf. Rep. 107-685, 148 Cong. Rec. H6586-01, H6638, 2002 WL 31119208 (noting need for such legislation was "articulated by an attorney who testified on behalf of a major airline manufacturer at the June 16, 1999, hearing on H.R. 2112" and going on to discuss the need for coordination particularly "in lawsuits arising out of major aviation disasters"); 147 Cong. Rec. H893-01, H896, 2001 WL 252448 (statement of Rep. Sensenbrenner, Jr.) ("I am just concerned over a common disaster case bringing about a huge plethora of lawsuits that would be filed in courts all over the country.  Given where the plaintiffs would live who were injured or killed in the plane crash, or where the airline was located, where the crash occurred, or the manufacturer of the plane and its component parts were situated, we could have lawsuits on the same disaster going on in every court.").  The Court recognizes the MMTJA was not enacted to address aircraft disasters only.  The point, instead, is

17

that an accident can straddle state lines (e.g., a train wreck at the border) and yet still result in deaths that occur in a location more particularized than an entire town.

### c.      The MMTJA's Purpose & Other Reference to "Location"

Nor is the Court persuaded by Removing Defendants' arguments that Plaintiffs' proposed interpretation would result in arbitrary distinctions in jurisdiction under the MMTJA.  Removing Defendants contend that, if the Court concludes the entirety of Lahaina is not a "discrete location" here, that could mean a plane crash that kills 75 people can be in federal court, but one that kills 74 people *and then* starts a fire in a town that kills 100 additional people could not be. *See* ECF No. 61 at 35.  Or, similarly, that a hotel fire that kills 75 people in one hotel could be in federal court, but not if those deaths were not confined to that initial hotel.  *See id.*  But the Court does not see the differing outcomes in those examples as arbitrary.  Instead, they conform with the purpose of the MMTJA.

Both parties agree that the MMTJA was enacted to provide a mechanism for cases arising out of a single catastrophic accident to be consolidated—for efficiency and consistency—in one federal court, given such accidents historically result in myriad actions filed in both state and federal courts across the country, and—unlike in the federal system—there is no way for one state court to transfer cases to another State's courts.  *See* ECF No. 42 at 16–18 (citing H.R. Conf. Rep.

18

107-685, 199, *reprinted in* 2002 U.S.C.C.A.N. 1120, 1151, 2002 WL 31163881;

148 Cong. Rec. H6586-01, H6638, 2002 WL 31119208; *Wallace v. La. Citizens Prop. Ins. Corp.*, 444 F.3d 697, 702 (5th Cir. 2006)); ECF No. 61 at 30 (citing *Wallace*, 444 F.3d at 702 and *Passa v. Derderian*, 308 F. Supp. 2d 43, 53 (D.R.I. 2004)).  Interpreting "discrete location" in a narrow geographic sense best serves this goal because, logically, the existence of common questions of liability and causation that would benefit from coordination are more likely to occur when the physical bounds are narrow.

For example, going back to Removing Defendants' hypotheticals, an airplane crash that also sets a town on fire, or a hotel fire that spreads to another hotel across the street, both present potentially distinct questions of liability and causation, including potentially complicated issues of various superseding causes. For example, if the sprinklers went off in the first hotel but its fire escapes were blocked, whereas the sprinklers did not go off in the second hotel, it is not clear the MMTJA's goals would be best-served by consolidating all those cases.  The same goes for the plane crash example, where liability related to the resulting fire could implicate different defendants and issues wholly irrelevant to the cases brought on behalf of the passengers.  In contrast, in the nightclub fire at issue in *Passa*, where MMTJA jurisdiction existed, everyone killed or injured was exposed to the same band's pyrotechnics at the same sponsors' event in the same owners' nightclub on

19

the same owners' property governed by the same municipality's fire codes, etc.
*See* 308 F. Supp. 2d at 47.  So too with a singular plane crash—everyone killed on impact rode on the same airline, in the same manufacturer's plane, with the same engine, flown by the same pilot, etc.

Focusing back on the Lahaina Fire underscores why, in light of these comparisons, "discrete location" should not span the entirety of Lahaina. Removing Defendants rely on a case discussing the meaning of "discrete location" in the context of Hurricane Katrina litigation.  *See Case*, 466 F. Supp. 2d at 797. In discussing whether either one or more levee breaches could constitute an "accident" within the meaning of the MMTJA, the district court in *Case* commented:

> In order for a levee breach to be the kind of accident intended to
> fall within the scope of section 1369, there would have to be at
> least seventy-five deaths that occur at a discrete location due to
> the breach. *The term discrete location would be bounded not
> physically, but by whether there exist common questions of fact
> among claimants as to liability and/or causation of damages.*
> This limitation of what constitutes a "discrete location" would
> preclude the exercise of section 1369 jurisdiction over actions
> arising out of "single accidents" that have widespread damages,
> and deaths that occur in a number of places and for different
> reasons, though the accident might precipitate such deaths.

*Id.* (emphasis added).  *Case* ultimately concluded—like other courts addressing the MMTJA in the context of Hurricane Katrina—that New Orleans was not a "discrete location."  *Id.* at 796.  But Removing Defendants rely on *Case*'s

discussion, highlighted above, that "discrete location" could be defined

conceptually by common questions of liability and causation.  *See* ECF No. 61 at

33.  The Court rejects this as unsupported by the MMTJA's plain language—which

clearly invokes a geographic boundary.

In addition to the discussion above regarding the common understanding of

the phrase "discrete location" in the context of the MMTJA, the Court notes that

the MMTJA's only other reference to "location" appears *alongside* the word

"State"—and in the *same sentence* as the MMTJA's initial reference to "discrete

location."  *See* 28 U.S.C. § 1369(a)(1) (providing that the MMTJA's interstate

component can be met if "a defendant resides in a State and a substantial part of

the accident took place *in another State or other location*") (emphasis added).

"State" is a defined term in the MMTJA, and "includes the District of Columbia,

the Commonwealth of Puerto Rico, and any territory or possession of the United

States."  *Id.* § 1369(c)(5).  Presumably, then, the word "location" should be

understood *throughout* the MMTJA to mean a geographic boundary or place rather

than one defined conceptually by common issues of liability when used in relation

to the deaths incurred.  *See United States v. Lopez*, 998 F.3d 431, 437 (9th Cir.

2021) ("The canon of consistent usage requires a court to presume that a given

term is used to mean the same thing throughout a statute *and is at its most vigorous*

*when a term is repeated within a given sentence*.") (citation and quotations omitted

and emphasis added); *Dubin v. United States*, 599 U.S. 110, 124 (2023) ("Under the familiar interpretive canon *noscitur a sociis*, a word is known by the company it keeps.") (citation and quotations omitted).  And, importantly, if a "location" is akin to a State, which "includes the District of Columbia," which is akin to a city, it is actually Defendants' proposed definition that would render the term "discrete" superfluous in attempting to define a "discrete location" as, essentially, akin to a city or town.

But even if the Court accepted this conceptually bounded meaning of "discrete location," Removing Defendants have not demonstrated the deaths from the Lahaina Fire are so "bounded."  Instead, at a high level, the deaths here range from those that occurred in relative close proximity to the morning fire near Lahainaluna Road, to ones that occurred after the fire spread (maybe spreading through some Landowner Defendants' properties, but not others), to ones where someone may have been more likely to die due to delays in evacuating either because of delayed warnings[12] or downed utility poles and power lines in their path out of Lahaina—all of which could have been separated in distance by miles.  *See*

---

[12]  Plaintiffs persuasively elaborated on this point at the hearing by noting that, whereas wrongful death and personal injury claims may implicate Maui County's failure to sound alarms and begin evacuations, the same would not necessarily be true for a claim based on a lost home because, as counsel put it, one cannot pick up their home and move it.

ECF No. 1-2 ¶ 57, ECF No. 56-2 ¶¶ 3, 6–7; ECF No. 56-3; ECF No. 71-2; ECF No. 71-3; ECF No. 71-4.

In an analogous context, the Court in *Case* concluded that the MMTJA's consolidation goals would not be served by assuming jurisdiction based on deaths caused by multiple levee breaches:

> For example, the breach at the 17th Street Canal could have been a result of poor maintenance, while a breach elsewhere could have been because of poor construction or design. Further still, there might be a finding that the flooding overtopped the levees at a particular point and there was no negligence involved. *Consolidation of cases where there exist such distinct issues of liability and causation of damages among the plaintiffs would not prevent duplicative litigation in State and federal court or otherwise foster judicial economy.*

466 F. Supp. 2d at 794 (emphasis added). So too here, given the disparate locations of the deaths—and with it potentially disparate issues of liability and causation. As detailed in a declaration provided by Plaintiffs in this action, the Lahaina Fire destroyed at least five different hotels and four different apartment complexes and communities. *See* ECF No. 56-2 (Apo Decl.) ¶¶ 4–5. In addition to the visual images Plaintiffs have provided, one of which is copied above, the declaration puts the dispersed nature of the deaths and destruction in stark perspective:

> There were over 2,200 separate house fires in Lahaina on dozens of different streets at over 2,000 different addresses. Fires occurred in multiple neighborhoods in Lahaina including Kelawa, Leialiʻi, Wahikuli, Mala Warf, Front Street, Puamana,

> and others.  My family home that burned down in Lahaina was
> about two-and-a-half miles from the homes that burned in the
> Hawaiian Homestead community of Leialiʻi, which were about
> four miles north of the homes that burned down in Puamana.
> Boats used as residences in Lahaina Harbor burned miles away
> from the thousands of other Lahaina house fires.

*Id.* ¶ 6.  The declaration goes on to list in detail the diverse locations where certain

individuals died, before offering that "the furthest distance north to south these

deaths occurred was 4 miles apart and the furthest east to west was about 2 miles

apart." *Id.* ¶ 7.

And so, as Plaintiffs correctly note, the Court here is not called to decide the

exact bounds of "discrete location" under the MMTJA—e.g., can *two buildings* be

a discrete location, or can an *entire block*?  Instead, it is only asked—and so only

concludes—that the deaths that occurred because of the Lahaina Fire did not occur

at a discrete location.  And, based on the foregoing discussion regarding the nature

of the Lahaina Fire in the context of the goals of the MMTJA, it cannot say this

conclusion will upend, impede, or erode Congress's intent in enacting the

MMTJA.

For that reason, the Court joins with courts like *Case*, interpreting the

MMTJA in the context of suits related to Hurricane Katrina, in deciding that just

like the entirety of New Orleans was not a "discrete location," neither is the

entirety of Lahaina.  *See Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc.*, 463

F. Supp. 2d 583, 591 (E.D. La. 2006) (concluding argument that the metro New

Orleans area was a "discrete location" was "untenable and would effectively deprive the Louisiana state courts of jurisdiction over any dispute related to Hurricane Katrina" and determining instead that a hospital was a "discrete location"); *see also Case*, 466 F. Supp. 2d at 796.  Nor does the Court find Removing Defendants' argument that Lahaina is geographically smaller than New Orleans particularly persuasive in light of the above discussion.  *See* ECF No. 61 at 36.

The Court acknowledges Removing Defendants' argument that, to an extent, the term "discrete location" is ambiguous because, simply put, everything is relative.  In other words, Front Street may be a discrete location compared to Lahaina, and Lahaina is a discrete location compared to Maui, and so too Maui is a discrete location compared to the State of Hawaiʻi.  But taking that argument to its logical end, there is no boundary—and that clearly cannot be what was intended with the use of the phrase "discrete location."  The Court thus rejects Removing Defendants' argument that Plaintiffs' proposed definition as smaller than a town is "arbitrary," as the line must be drawn somewhere.

### d.    The MMTJA's Reference to Multidistrict Litigation

As a final note about the phrase "discrete location" in the context of the MMTJA, the Court finds persuasive Plaintiffs' argument that all of Lahaina should not be a "discrete location" in light of the MMTJA's requirement that a district

25

court must alert the judicial panel on multidistrict litigation of any action pending under the MMTJA.  *See* 28 U.S.C. § 1369(e).  The parties make no reference to cases seeking recompense for personal injuries or personal or real property loss incurred as a result of the Lahaina Fire in any court *other than* Hawaiʻi state courts. And at the hearing, the parties confirmed they were not aware of any such case. This point emphasizes that the Court's conclusion regarding the meaning of a "discrete location" here in no way impedes the coordination of actions scattered across state and federal courts across the country.

### 3.    Legislative History and Remaining Considerations

Even if turning to additional legislative history was necessary, the Court finds doing so would only underscore the conclusion that the deaths here did not occur at a discrete location.  As Plaintiffs note, and as *Case* discussed, debate about early drafts of the MMTJA reveals the statute was a narrow expansion of federal jurisdiction: the MMTJA was intended to address single, catastrophic accidents that happened in a location that could be pinpointed—not accidents encompassing multiple neighborhoods within a town and spanning miles.  Specifically, the accidents that Congress repeatedly envisioned as bringing cases into federal court were airplane crashes, bridge collapses, hotel fires, train wrecks, or bus accidents. *See Case*, 466 F. Supp. 2d at 792–94 & n.20, 798 (citing H.R. Rep. No. 102–373 (1991), 136 Cong. Rec. H3116–17 (daily ed. June 5, 1990) (statement of Rep.

Kastenmeier); 136 Cong. Rec. H3116–18 (daily ed. June 5, 1990) (statement of Rep. Fish)). There can be no dispute that most deaths resulting from such accidents are highly likely to occur on impact or on site and thus be constrained to a relatively small geographic boundary.

In response, Removing Defendants note that this legislative history includes a reference to "environmental spills" alongside these examples—and that an environmental spill is unlikely to be limited to a small geographic area, meaning Congress could not have intended "discrete location" to be so limited. *See* ECF No. 61 at 34–35 (citing *Nguyen v. ANPAC La. Ins. Co.*, 2006 WL 3714500, at *2 (E.D. La. Dec. 11, 2006) (citing 147 Cong. Rec. H893-01 (2001); 137 Cong. Rec. E1923-02 (1991))). The Court acknowledges the inclusion of "environmental spills" is different in kind from the examples like plane, train, or bus crashes or hotel fires. But, while examples of the latter types of accidents easily come to mind, the Court is unaware of any example where an "environmental spill" has resulted in the death of at least 75 people. And at the hearing, Removing Defendants could not offer any.[13] So, while it may be that such a spill could

---

[13] During the hearing, counsel referenced the *Deepwater Horizon* disaster in an attempt to illustrate that an environmental spill is the sort of "accident" envisioned by the MMTJA, and so "discrete location" in the statute must involve areas of some expanse. But that tragedy involved a well blowout that caused an explosion and fire, followed by an oil spill. *See, e.g.*, *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, 168 F. Supp. 3d

contaminate a geographic area much larger than the area where the deaths occurred here, the Court finds it difficult to place much weight on this single, outlier reference in the legislative history.  *See* ECF No. 71 at 8 n.4.

Nor is the Court persuaded by Defendants' attempt to cite *other* statutes' use of the term "discrete" to draw the appropriate line here—and draw it at a location *not* limited in *size* but instead, essentially, limited only by being *definable*.  *See* ECF No. 61 at 33 (citing *NW Ecosystem All.*, 475 F.3d at 1138, discussing a policy statement related to the Endangered Species Act noting the term "discrete" connotes "separateness" and is not limited to a certain size).  The Court does not find this authority, addressing segments of fish or wildlife populations, remotely helpful in analyzing a statute aimed at coordination of catastrophic accidents.  *See* *Yates*, 574 U.S. at 537 ("We have several times affirmed that identical language may convey varying content when used in different statutes[.]").  In any event, the Court can come up with its own competing examples where use of the term "location" in other statutes would support Plaintiffs' argument here that a *discrete* location cannot be a town.  *See* 23 U.S.C. § 151(f)(8)(E) ("A project receiving a grant under this paragraph may be located on any public road or in other publicly accessible locations, such as parking facilities at public buildings, public schools,

---

908, 910–11 (E.D. La. 2016).  And in an explosion, like a plane crash or bridge collapse, the locations of resulting deaths are not likely to be geographically disparate.

and public parks, or in publicly accessible parking facilities owned or managed by

a private entity."); 12 U.S.C. § 30(b) ("Any national banking association, upon

written notice to the Comptroller of the Currency, may change the location of its

main office to any authorized branch location within the limits of the city, town, or

village in which it is situated[.]"); 19 U.S.C. § 1414(d)(1) ("The term 'designated

location' means a customs office located in the customs district designated by the

entry filer for purposes of customs examination of the merchandise."); *cf. Chen v.

Major League Baseball*, 6 F. Supp. 3d 449, 456 (S.D.N.Y. 2014) ("FanFest is

alleged to have taken place at a discrete location (the Javits Center)[.]").  As the

Supreme Court has counseled, though, none of this is all that illuminating.  *See

Yates*, 574 U.S. at 537–38.

Instead, what is illuminating is the fact that when the Court looks at the

words "discrete location," an entire town is not called to mind and, even when it

views that term in the context of the rest of the MMTJA and its overall purpose,

the meaning that *does* come to mind remains unaltered.

## B.    Other Actions Removed Based Only on the MMTJA

As noted previously, around 90 other actions have been removed based

solely on the MMTJA.  At the hearing, Removing Defendants would not concede

that if the Court concludes jurisdiction is lacking under the MMTJA here, so too is

it lacking under those other cases.  But if Lahaina is not a "discrete location" for

29

purposes of this action, that legal conclusion applies across the board, and removal under only the MMTJA was improper in each of those actions.  In most of those cases, the plaintiffs have already moved to remand.  The Court will thus begin the process of entering orders granting those motions and remanding those actions based on the reasoning articulated here—and doing so sua sponte, as it may, in any such case where no motion was filed.  *See* 28 U.S.C. § 1447(c).

## IV.   CONCLUSION

Answering the original question—Where does this case belong?—is straightforward.  It belongs in the state court on Maui where it originated.  And so Plaintiffs' motion, ECF No. 42, is GRANTED.  The Court therefore REMANDS this action to the Circuit Court of the Second Circuit, State of Hawai'i.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, March 11, 2024.



Jill A. Otake
United States District Judge

CIVIL NO. 23-00460 JAO-BMK, *Sheikhan, et al. v. Hawaiian Electric Industries, Inc., et al.*, ORDER GRANTING PLAINTIFFS' MOTION TO REMAND, ECF NO. 42.